## LILLY HARRIS v. CLIFFORD C. WOOD.[1]

March 26, 1943.

No. 33,338.

[1]Reported in 8 N. W. (2d) 818.

*Hoke, Cobb & Janes* and *Phillips, Sherwood & Hughes,* for appellant.

*Doane & Hengel,* for respondent.

PETERSON, JUSTICE.

Action for wrongful death caused by defendant's malpractice. Defendant appeals from the judgment entered after the court denied his motion for judgment notwithstanding the verdict in favor of plaintiff.

In accordance with the rule in such cases, we shall consider the evidence in a view most favorable to the verdict.

The decedent, Edward Donald Harris, was the adopted son of plaintiff and her husband. At the time of his death he was 25 years old and in good health. He was of good character, excellent habits, industrious, capable, and well disposed toward his parents, with whom he lived and whom he helped to support.

On July 14, 1941, decedent had some teeth extracted by defendant, a regularly licensed and practicing dentist with offices in St. Cloud. Pursuant to arrangement, defendant administered gas to him to anesthetize him while the teeth were being extracted. Gas was used as an anesthetic because decedent had taken it twice before for the same purpose without any ill effect or unpleasantness.

Plaintiff accompanied decedent to defendant's office and was present during all the time he was there, except when she went down to the street briefly on two occasions to look for a policeman and explain to him why decedent's automobile was parked overtime for the purpose of avoiding having the car tagged.

When they arrived at defendant's office, they informed him that decedent had taken some anacin to alleviate the toothache in the teeth to be extracted. Defendant then gave decedent some nembutal in a glass of water and had him sit in the waiting room. After about one-half or three-quarters of an hour defendant had decedent return to the operating room and sit in the dental chair.

Then he had plaintiff leave the room, and he commenced to administer the gas.

The so-called gas is a mixture of nitrous oxide and oxygen. It is generally administered with a mixture of 93 percent of the former and seven percent of the latter. Anesthesia is produced by excluding oxygen from the blood, thereby inhibiting and temporarily paralyzing sensory centers.

The gas is lethal and should be handled as such. When properly administered, however, it is one of the safest of anesthetics. The administration of too large a quantity or too high a concentration of gas is likely to cause death by paralysis of the respiratory center and cessation of the vital process of breathing. Oxygen in the blood is essential to heart action, which will stop if the exclusion of oxygen therefrom is excessive.

Proper administration of gas as an anesthetic necessarily involves the exercise of due care to guard against the dangers incident to its use. The exclusion of oxygen from the blood produces changes in the action of the eyes, breathing, and the color of the skin by which the patient's condition can be observed. When sufficient gas has been administered to anesthetize the patient, his skin becomes cyanotic or bluish in color. While cyanosis is a normal condition in the process and in itself is not a danger signal, it marks the point beyond which further administration of the gas might entirely stop respiration, and consequently might be dangerous. When the patient is getting too much gas, he struggles for oxygen. Defendant testified that in fighting for oxygen under such circumstances the patient "makes a crowing noise in the throat that nobody would overlook." He also characterized the noise as a gurgling one.

Defendant's testimony was to the effect that he connected the apparatus for administering the gas to decedent's mouth and nose and that he brought him under in a minute. Decedent was then cyanotic. Then defendant disconnected the mouth part of the apparatus. He continued to administer gas through the nose for another two minutes, while he extracted three teeth. Then he dis-

covered that something had gone wrong. Defendant's brother, who was assisting him, came out into the waiting room and said that they had run into difficulty. They laid decedent on the floor, sent for the fire department rescue squad, and tried to resuscitate him, but without success. He had died while in the dental chair.

When plaintiff left defendant's operating room, she took a seat in the waiting room, where she could hear what transpired in the operating room. There was only a thin partition with some glass in it between the two rooms. Almost immediately after defendant commenced to administer gas to decedent she heard a gurgling noise. Defendant testified that the gurgling noise which she heard was the gurgling of water in a cuspidor attached to the dental chair, not the "peculiar gurgling or rattling in the throat." In addition, she heard some commotion in the operating room. There was no evidence to show that the noise which she heard was made at any time other than that to which she testified.

There was a conflict in the evidence as to the causal connection between the administration of the gas and decedent's death requisite under the rule that negligence to be actionable must be a, but not the sole, cause of the death or injury complained of. See Guild v. Miller, 199 Minn. 141, 271 N. W. 332; Bibb Broom Corn Co. v. A. T. & S. F. Ry. Co. 94 Minn. 269, 102 N. W. 709, 69 L. R. A. 509, 110 A. S. R. 361, 3 Ann. Cas. 450. For plaintiff, there was evidence to the effect that the anesthetic was a cause, but not the sole one, of death; for defendant, that decedent died of heart failure.

Plaintiff's evidence consisted of a certified copy of the death certificate, the opinion testimony of Dr. P. E. Stangl, and certain facts and circumstances. The death certificate showed that decedent died at an address shown to be defendant's office of "Asphyxia by nitrous oxide Gas—during extraction of teeth." Dr. Stangl, who gave an opinion, stated that decedent died in the dental chair as a result of the anesthetic or the shock of the extraction of the teeth, or both. He qualified the opinion by stating: "I think that a man that gets a nitrous oxide anesthesia over

a period of three minutes and dies and has had sufficient nitrous oxide to produce an anesthesia has had a lot of nitrous oxide. It is not likely that factors other than the lack of oxygen caused death."

For defendant, there was opinion evidence by two other dentists practicing in St. Cloud to the effect that defendant exercised reasonable care according to the standards prevailing among dentists in good standing in that community and that death was caused, not by the gas, but by heart failure. Effort was also made to overcome and impeach the death certificate and thus destroy its effect as *prima facie* proof of the cause of death.

Defendant testified that he did not know the cause of death. His testimony showed that he had made a special study of the use of gas and of anesthesia and that he was well informed not only about those subjects, but also about the subject of shock as a cause of death. He stated: "Ordinarily when a man passes out and dies from gas there is a peculiar gurgling or rattling in the throat. This symptom does not develop from shock." The dentists called by him to give opinions were men of considerable experience in the profession, but it was not shown that they were any better qualified to give an opinion as to the cause of death than he was. Furthermore, they labored under the handicap of basing an opinion upon an assumed set of facts shown by defendant's testimony, whereas he had firsthand knowledge thereof, as the principal actor in what transpired to bring about decedent's unfortunate death.

The effort to overcome the effect of the death certificate as *prima facie* evidence of the cause of death consisted almost entirely of a showing that Dr. J. N. Libert, the deputy coroner, who signed it, based his statement therein, to the effect that death resulted from asphyxia, upon the report of the post-mortem examination made by Dr. Stangl and that Dr. Stangl testified that death was caused either by asphyxia or shock, or both.

Such evidence did not cover the entire field involved. Immediately after the post-mortem examination and before Dr. Stangl's findings were reduced to writing, he made a communication to Dr.

Libert concerning the matter, which was not disclosed by the evidence. It further appeared that the coroner himself appeared on the scene almost immediately, made some investigation in which he interviewed defendant and his brother, and then turned the case over to his deputy. Nor were the results of the investigation shown by the evidence.

The questions for decision are (1) whether there was any evidence to show that the administration of the gas was a cause of death, and (2) whether there is any evidence to show that defendant was guilty of negligence in administering it.

■ There was evidence to show that asphyxiation caused by the administration of the gas was a cause of decedent's death.

By Minn. St. 1941, § 144.27 (Mason St. 1927, § 5366), it is provided that a certified copy of a death certificate "shall be prima facie evidence of the facts therein stated in all courts in this state." A certificate of death, being only *prima facie* evidence of the cause of death, may be contradicted and explained. Krema v. Great Northern L. Ins. Co. 204 Minn. 186, 282 N. W. 822. In the instant case the effect of the certificate as *prima facie* evidence of the cause of death was not destroyed, because the evidence to the contrary did not go to all the facts upon which the certificate was based. While the contradictory evidence goes to the findings of the post-mortem examination written after the certificate was signed, it does not include the oral communication, made before the certificate was signed, by the doctor who made the examination, to the deputy coroner. Nor does it include the evidence obtained by the coroner in his investigation, including the disclosures made to that official by defendant and his brother.

Aside from the certificate of death, there was evidence to show that decedent died from asphyxia. While Dr. Stangl expressed the opinion that decedent died from asphyxia or shock, or both, he practically excluded shock as a cause of death by stating that it was not likely that factors other than lack of oxygen caused death. Defendant's own evidence went far to eliminate shock as a cause of death, because he testified that a gurgling sound is

present in cases of death by asphyxiation, but not by shock. Plaintiff's testimony showed that there was a gurgling sound. This, according to defendant's own view, eliminated shock as the cause of death. The opinion evidence of the two dentists who testified for defendant that decedent died of heart failure did not, as a matter of law, overcome the evidence to support the view that asphyxia was a cause of decedent's death. The evidence as a whole made the question one of fact for the jury. Golden v. Lerch Bros. Inc. 203 Minn. 211, 281 N. W. 249.

■ There is no dispute that the rule is that the duty of a dentist in administering an anesthetic to a patient is to exercise such reasonable care and skill in that behalf as is usually exercised by dentists of good standing in the community where he practices. In our opinion, defendant employed the methods and techniques considered to be good practice according to such standards. The real question is whether in the particular manner in which he employed such methods and techniques he exercised due care. We think the evidence supports a finding that he did not. On the one hand, there was evidence that he gave an overdose of nitrous oxide gas. After he had brought decedent into a state of anesthesia, he continued for two more minutes to administer gas to him through the nose. According to Dr. Stangl, this was "a lot of nitrous oxide" gas, and consequently it was not likely that other factors than the lack of oxygen caused death. According to defendant's testimony, the use of gas if carried too far is deadly, and the safety point is reached when cyanosis sets in. The fact that decedent underwent two prior administrations of the gas for teeth extractions tends to show that he was able to withstand the effects of gas without shock. It was a fact question whether defendant was negligent in continuing to administer the gas after the safety point had been reached. It is negligence for a dentist to persist in the use of an anesthetic on a patient after a warning which would impel a person of reasonable prudence to desist. In speaking of the liability of a physician in such case, in Moehlen-

brock v. Parke, Davis & Co. 145 Minn. 100, 102, 103, 176 N. W. 169, 170, we said:

"When that condition [cyanosis] appears it is a signal of warning to a physician that, if the ether is persisted in, it is dangerous, and if persisted in too much it will cause the death of the patient.

\*   \*   \*   \*   \*

"He is liable if his mistake of judgment is so gross as to constitute negligence. \* \* \* He is bound to observe plain physical laws, or \* \* \* he may be liable when his wrong concerns physical facts and is governed by ordinary principles of intelligence. *If a surgeon persists in the use of an anesthetic after warning which would impel one of reasonable prudence to desist, he should be held to answer for the consequences.*"   (Italics supplied.)

In accord, 41 Am. Jur., Physicians and Surgeons, p. 212, § 95.

Our conclusion is that both questions presented for decision should be answered in the affirmative and that there should be an affirmance.

Affirmed.

