Argued January 16; reversed February 27; rehearing denied June 19, 1945

# SEATER *v.* PENN MUTUAL LIFE INSURANCE COMPANY OF PHILADELPHIA

(156 P. (2d) 386, 159 P. (2d) 826)

Before BELT, Chief Justice, and ROSSMAN, BAILEY, LUSK and HAY, Associate Justices.

*James C. Dezendorf,* of Portland (Hampson, Koerner, Young & Swett, of Portland, on the brief), for appellant.

*Zanley F. Galton,* of Portland (Goldstein, Galton & Galton and Charles Coston, all of Portland, on the brief), for respondent.

HAY, J.

Action by the beneficiary under two policies of life insurance, each in the sum of $1,000, with provision for

double indemnity if the death of the insured should result solely from bodily injuries effected directly and exclusively by external, violent, and accidental means, such double indemnity not to be payable, however, if death resulted directly or indirectly from illness or disease of any kind, or from physical or mental infirmity. The insured, who was the wife of the plaintiff, died on March 29, 1943, at the age of upwards of sixty-one years. The insurance company paid the single indemnity. The beneficiary claimed that insured's death resulted from bodily injuries effected by accidental means within the terms of the policies. The insurance company refused to concede such claim. Thereupon this action was instituted. The insurance company defended upon the alleged grounds that the insured died as a direct or indirect result of illness or disease, or of physical or mental infirmity.

Motions for involuntary nonsuit, and for a directed verdict, were seasonably interposed by defendant during the trial, each of which was denied. The jury rendered a verdict against the defendant. Defendant moved for judgment notwithstanding the verdict, and, in the alternative, for a new trial. This motion was denied, and judgment was entered accordingly. The defendant has appealed.

The policies were dated July 18, 1924. On September 8, 1942, the insured was committed to the Oregon State Hospital. The hospital record showed that she was suffering from ''complete mental confusion, loss of memory and disorientation''. Her condition was diagnosed as ''psychosis with cerebral arteriosclerosis''. On March 12, 1943, while in a room or ward of the State Hospital, the insured suffered a fall. She died seventeen days thereafter, the immediate cause of

death being duly certified as fracture of right hip, with "arteriosclerosis, generalized" as "other conditions".

No one actually saw her fall, but an attendant in charge of the ward testified that she heard "the commotion caused by the fall". The plaintiff offered in evidence a duly certified copy of the death certificate, which was received, over objection, as proof that the fall was accidental. This is assigned as error.

The Oregon Vital Statistics Act (chapter 130, Or. L., 1941) is substantially the uniform act framed by the National Conference of Commissioners on Uniform State Laws. Section 27 of the Oregon act provides for compulsory registration of certificates of death. Section 28 requires the funeral director to procure an official form of death certificate, and enter certain personal data thereon. Having done so, he must present the certificate to the physician last in attendance upon the deceased, who is required to certify, over his signature, the cause of death, to his best knowledge and belief. Section 10 provides that the forms of the various certificates required to be used under the act "shall include as a minimum the items required by the respective standard certificates as recommended by the United States bureau of census". Under the form of death certificate which has been adopted, the attending physician must state, when the death was due to external causes, whether such causes were the result of accident, suicide, or homicide. That portion of the death certificate in the present case reads as follows:

"If death was due to external causes, fill in the following:
(a) Accident, suicide, or homicide (specify) *Accident*.

(b)  Date of occurrence *March 12, 1943*

(c)  Where did injury occur? (City or town) *Salem,* (County) *Marion,* (State) *Oregon*

(d)  Did injury occur in or about home, on farm, in industrial place, in public place? *In State Hospital* While at work? *No* (e) Means of injury *Fall.*"

The certificate was signed by Paul S. Wolfe, M. D.

Section 11 of the act provides: "Each certificate, as provided for in this act, * * * shall be prima facie evidence of the facts therein stated. * * * "

The appellant takes the position that a statute, which makes a death certificate prima facie evidence of facts therein stated, is designed only for public purposes, and has no application to private controversies between adverse parties. Appellant concedes that there is a sharp conflict in the decisions upon this question. In *Beglin v. Metropolitan Life Ins. Co.,* 173 N. Y. 374, 66 N. E. 102, it was held that such a statute is a mere police regulation, required for public purposes, and that certificates issued by virtue thereof are prima facie evidence so far only as questions involving public rights are concerned. The court expressed its opinion that it was not the intention of the legislature, by such statute, to change the common-law rules of evidence in controversies between private parties arising out of contract. Similar holdings were made in *In Re Curtiss' Will,* 250 N. Y. S. 146, 140 Misc. Rep. 185; *Oklahoma Aid Ass'n. v. Thomas,* 125 Okla. 190, 256 P. 719; *Dent v. National Life & Accident Ins. Co.,* 6 S. W. (2d) 195; (The two cases last mentioned arose under statutes which required the physician to state only whether the death was "probably" accidental, suicidal, or homicidal. The Dent case apparently was over-

ruled by the later case of *American National Ins. Co.
v. Hernandez* (Tex.) 104 S. W. (2d) 525.) *United States
v. Johnson*, 72 F. (2d) 614; (This case held that the
admission in evidence of a death certificate filed with
the Bureau of Vital Statistics of Chicago Department
of Public Health to show the death of decedent and
the date thereof was error in a civil suit. There was
an additional objection, however, that the certificate
was not duly authenticated.) *United States v. Black-
burn*, 33 F. (2d) 564, and *United States v. Harrison*,
49 F. (2d) 227; (These were war risk insurance cases,
and the holdings therein were based upon *Sullivan v.
Seattle Electric Co.*, 51 Wash. 71, 97 P. 1109, 130 Am. St.
Rep. 1082, discussed hereunder.) *Levy v. Vaughan*,
42 App. D. C. 146.

In *Sullivan v. Seattle Electric Co.*, supra, the proof
of cause of death was the report of a deputy coroner
to the county auditor. The appellate court commented
that it was formerly held that the record of the cor-
oner's inquest was competent, but not conclusive, evi-
dence of cause of death, in all civil actions, because
it was the result of an inquiry, made under competent
public authority, to ascertain matters of public interest
and concern. This rule, the court said, still prevails
in a few jurisdictions, but the great weight of modern
authority is against it. The coroner's report to the
county auditor, however, stands on a lower plane than
the record of a coroner's inquest. It is made merely
as a part of the records of vital statistics required to
be maintained by law. Admission of the report in
evidence was held to be error. The law, however,
(chapter 98, Laws 1891) did not make the records of
vital statistics prima facie evidence of facts stated
therein.

■ The objection to the admission of the physician's certificate of death is, of course, grounded upon the fact that, in so far as it undertakes to show that death resulted from accidental violence, it is hearsay. The respondent contends, however, that such certificates are admissible under an exception to the hearsay rule. (Writings, of course, as well as oral testimony, may be hearsay. 20 Am. Jur., Evidence, section 451.) In *Southland Life Ins. Co. v. Brown,* 121 S. W. (2d) 653, a death certificate, which was received in evidence, stated that the insured committed suicide. The Texas statute which the court construed made properly certified copies of such certificates prima facie evidence of the facts therein stated. It was held that receipt of the certificate in evidence was not error, but the court commented:

"* * * However, the presumption in favor of the truth of the facts therein recited can be no stronger than the evidence authorizing the making of such statement in the original certificate. The jury was not required to accept the recitations contained in such certificate as conclusive proof of the fact that the insured committed suicide."

In *Labofish v. Berman,* 55 F. (2d) 1022, 60 App. D. C. 397, the question of the propriety of admitting a death certificate in evidence for the purpose of proving, prima facie, the time, place and cause of death, was considered. The court concluded that the trend of modern authority is in favor of the admission of such certificates, as public records, citing a number of cases, including *State v. McDonald,* 55 Or. 419, 103 P. 512, 104 P. 967, 106 P. 444.

*Guardian Life Ins. Co. of America v. Kissner,* 111 F. (2d) 532, was an action to recover double indemnity on two life insurance policies. A death certificate

which was received in evidence stated that the principal cause of death was septic bronchial pneumonia, with diffuse cellulitis as a contributory cause. It stated further that death resulted from an accidental fall. The court held that the certificate was competent prima facie evidence of those facts, by virtue of the Missouri statutes (section 5816, Rev. St. Mo. 1919; sections 9046, 9060, Rev. St. Mo. 1929), which made such certificates prima facie evidence of the facts therein stated.

*Krug v. Mutual Benefit Health & Accident Ass'n.,* C. C. A. 8, 120 F. (2d) 296, was an action for accidental death benefits under insurance policies. The physician's certificate of death received in evidence stated:

"The principal cause of death and related causes of importance in order of onset were as follows: Cerebral Hemorrhage. * * * Contributory causes of importance not related to principal cause: Leukemia. * * *"

Other parts of the certificate, requiring the physician to specify, where death was due to external causes, whether such causes were the result of accident, suicide or homicide, etc., were not filled in by the physician. The Kansas statute made a certified copy of such certificates prima facie evidence in all courts and places of the facts stated therein. In rebuttal, plaintiff offered in evidence an "attending physician's certificate", executed by the same physician in connection with proofs of death furnished to the insurance company, on a form provided by it, in which the physician stated that the principal cause of death was cerebral hemorrhage and the contributory cause "leukemia, date of onset uncertain". This certificate stated further that insured "had fall and bruised leg 2 weeks before. Uncertain if it had any bearing." The trial court

held that the official death certificate was admissible by statute, as a public record stating the fact and cause of death, and that, while the facts stated therein were subject to rebuttal, they could not be rebutted or explained by the hearsay statements of the doctor who signed the medical certificate.

*Hunter v. Derby Foods,* 110 F. (2d) 970, 133 A. L. R. 255, 258, was an action for damages for death by wrongful act. A death certificate was received in evidence in proof of the cause of death. Held, that the certificate was properly received, both under the federal act (28 USCA, section 695), as a record made in the usual course of business, and under the New York act (New York Civil Practice Act, section 367), as a certificate required to be made and filed by a public officer touching an act done by him in the course of official duty.

■ Despite the impressive reasoning of the courts which have refused to admit death certificates, in controversies between private parties, as evidence of all of the facts stated therein, we feel that we are bound, by the clear terms of the Oregon statute, to hold that it was the intention of our legislature that such certificates should be so received. The inquiry, then, must be directed to the question of whether or not a physician's statement, in a death certificate, that deceased came to his death by accidental violence, is a "fact" within the contemplation of the act.

*Backstrom v. New York Life Ins. Co.,* 183 Minn. 384, 236 N. W. 708, was an action upon a life insurance policy, in which the defense was that the insured had committed suicide. The coroner's certificate of death stated the cause of death as "suicide by firearm". The statute made such certificate prima facie evidence in

all state courts "of the fact therein stated". It was held that the admission of the certificate in evidence was error. The statute required, in case of death by violence, that the means and circumstances be stated. The means were stated, but not the circumstances, and hence the certificate did not comply with the statute. In making the certificate prima facie evidence, the statute confined itself to "facts", and made no reference to indications, inferences, or conclusions drawn by the certificate maker. The court said that evidence, in order to be admitted as trustworthy, must be solemnized by an oath, and be subject to cross-examination by the opposing party. Certain exceptions to the hearsay and opinion rules, it was conceded, are recognized from necessity, but the court was not persuaded that the conclusions and inferences drawn by the certificate maker, as to whether the violence was suicidal, homicidal, or accidental in character, should be prima facie evidence in actions between private parties. See comments on this case in 46 Harvard Law Review at page 1164. Professor Wigmore criticizes the Backstrom opinion as "an over-strict interpretation of the statute". Wigmore, Evidence, 3 ed., section 1646, note 2. See also *New York Life Ins. Co. v. Anderson,* (C.C.A. 8) 66 F. (2d) 705; *Anderson v. National Acc. Soc.,* 260 N. Y. S. 862, 145 Misc. 804; *Greenberg v. Prudential Ins. Co.,* 40 N. Y. S. 494, 266 App. Div. 685; *Henninger v. Inter-Ocean Casualty Co.,* 217 Ill. App. 542; *Williams v. Metropolitan Life Ins. Co.,* 116 S. C. 277, 108 S. E. 110; *Johnson v. Sundbery* (La. App.) 150 So. 299; *Allegheny Trust Co. v. State Life Ins. Co.,* 110 Pa. Supr. Ct. 37, 167 A 251.

In *Morton v. Equitable Life Ins. Co.,* 218 Iowa 846, 254 N. W. 325, 96 A. L. R. 315, the death certificate,

issued by a coroner, gave the cause of death as "suicide by hanging". The Iowa statute made such certificate "presumptive evidence in all courts and places of the facts therein stated", but required that, when suicide was given as the cause of death, it should be modified by the word "probably". This was not done. Held, that the statement of the coroner as to the cause of death was a mere conclusion or opinion, and not a "fact" within the contemplation of the statute. Professor Wigmore expresses disapproval of the holding, saying:

"* * * thus does a Court consider itself entitled to read words of express command out of a progressive statute, because the Court looked upon its law learned before the statute as unchangeably sanctified."

Wigmore, op. cit., section 1646, note 2.

A similar decision is *Equitable Life Assur. Soc. v. Stinnett*, (C. C. A. 6) 13 F. (2d) 820, the Kentucky statute therein construed also requiring the use of the word "probably" where the cause of the injury was stated as being accidental, suicidal, or homicidal. In a later decision *(Fidelity Mutual Life Ins. Co. v. Hembree*, 240 Ky. 97, 41 S. W. (2d) 649), however, the Court of Appeals of Kentucky permitted a death certificate (which was the only proof in the case supporting plaintiff's claim that the assured's injury was accidentally brought about), to be received in evidence. This case was followed and approved in *Troutman v. Mutual Life Ins. Co.*, (C. C. A. 6) 125 F. (2d) 769.

Other cases in which the respective statutes required the death certificate to state, in cases of death by violence, whether the injury was "probably" accidental, suicidal, or homicidal, and the courts held that the certificates were properly excluded, include *Life*

*Ins. Co. of Virginia v. Brockman,* 173 Va. 86, 3 S. E. (2d) 480; *Rees v. Jefferson Standard Life Ins. Co.,* 216 N. C. 428, 5 S. E. (2d) 154.

On the other hand, the editors of American Jurisprudence state the general rule to be as follows:

"While the courts are not entirely agreed as to the admissibility in evidence of a physician's certificate as to cause of death, according to the majority rule the record or certified copy thereof is admissible to show the cause of death of the person named in the certificate where it is made pursuant to statute and the record is properly kept as required by law."

29 Am. Jur., Insurance, section 1489.
See also 20 Am. Jur., Evidence, section 1034; 8 Couch, Insurance, section 2200.

In *California State Life Ins. Co. v. Fuqua,* 40 Ariz. 148, 10 P. (2d) 958, the statute made a certified copy of a death record prima facie evidence of the facts therein stated. The certificate in question stated that Fuqua died of gunshot wounds "inflicted by officers Rader and Smith". The court rejected the argument that this was a mere expression of opinion, saying:

"There is no doubt that the Legislature may, if it desires, change the rules of evidence. The statute in question expressly directs the coroner to state whether the death appears accidental, suicidal, or homicidal. Unless this opinion of the coroner's jury is to be considered as a 'fact' and used in evidence, it is absurd for the Legislature to require it to be inserted in the certificate, for it would be purposeless. We therefore hold that the clause in regard to how the gunshot wound was inflicted should have been admitted in evidence with the rest of the certificate, as prima facie evidence not merely that the

death was caused by a gunshot wound, but as to why and how the wound was inflicted. Jensen v. Continental Life Ins. Co., supra."

See also *In re Olson's Estate*, 176 Minn. 360, 223 N. W. 677.

In *Massachusetts Mutual Life Ins. Co. v. Bush*, 236 Ky. 400, 33 S. W. (2d) 351, the death certificate stated: "The cause of death was as follows: Self inflicted gun shot wound through head." The court refused to allow the certificate to be read to the jury. Held, error. We quote from the opinion:

"The court refused to allow the paper to be read to the jury, and the company excepted. The statute only makes the certificate prima facie evidence. It is within the power of the Legislature to prescribe rules of this sort. The statute is valid. The circuit court erred in refusing to allow the certificate to be read. Louisville & N. R. v. Rowland, 215 Ky. 663, 286 S. W. 929; Metropolitan Life Ins. Co. v. Cleveland, 226 Ky. 621, 11 S. W. (2d) 434; Inter-Southern Life Ins. Co. v. Hinkle, 266 Ky. 724, 11 S. W. (2d) 913. Louisville R. Co. v. Raymond, 135 Ky. 738, 123 S. W. 261, 284, 27 L. R. A. (N. S.) 176, which appellee relies on, rests upon this ground as shown by the opinion: 'While the statute requires the physician to give the death certificate, there is nothing in the statute making the certificate evidence in judicial proceedings.' The present statute does this."

In *Dow v. United States Fid. & Guar. Co.*, 297 Mass. 34, 7 N. E. (2d) 426, the court held that no error was committed by the admission of a death certificate in evidence to prove that injury and death were accidental. The certificate showed the cause of death as "Burns of body and legs. Accident. Exposed to scalding water in bath tub." The statute made the certificate "prima

facie evidence of the facts recorded.'' In holding that the certificate was properly admitted, the court said:

'' * * * Cause and manner of death in a report of this kind are necessarily matters of opinion or judgment deduced from other facts found rather than matters of direct observation. * * *''

See also *LaCount v. General Asbestos & Rubber Co.*, 184 S. C. 232, 192 S. E. 262; *Krema v. Great Northern Life Ins. Co.*, 204 Minn. 186, 282 N. W. 822; *Harris v. Wood*, 214 Minn. 492, 8 N. W. (2d) 818; *Abbott v. Prudential Ins. Co.*, 89 N. H. 149, 195 A. 413; *Bozicevich v. Kenilworth Mercantile Co.*, 58 Utah 458, 199 P. 406, 17 A. L. R. 346, and annotation: Wigmore, Evidence, 3 ed., section 1646.

■ It is competent for the legislature to make a death certificate prima facie evidence of the facts shown therein. 20 Am. Jur., Evidence, section 9; Idem, section 1214; *Northwestern Electric Co. v. Zimmerman*, 67 Or. 150, 135 P. 330, Ann. Cas. 1915C, 927.

The certificate is upon a printed form. A portion of it reads: ''If death was due to external causes, fill in the following: (a) Accident, suicide, or homicide (specify)''. The physician filled in the word ''Accident''. Another portion reads: ''Means of injury'', and the physician filled in ''Fall''. In view of the fact that, in popular language, any casualty or mishap is usually considered an accident, there would appear to be in the physician's statement a patent ambiguity.

''The word 'accident' does not have a settled legal significance. It does have, however, a generally accepted meaning, which is the same whether considered according to the popular understanding or the approved usage of language. An 'accident' is simply an undesigned, sudden, and unexpected

event, usually of an afflictive or unfortunate character, and often accompanied by a manifestation of force."

*Gilliland v. Cement Co.*, 104 Kan. 771, 180 P. 793. See also *Trevathan v. Mutual Life Ins. Co.*, 166 Or. 515, 113 P. (2d) 621. However, it was held in *Landress v. Phoenix Mutual Life Ins. Co.*, 291 U. S. 491, 78 L. Ed. 934, 54 S. Ct. 461, 90 A. L. R. 1382, (opinion by Mr. Justice Stone, with Mr. Justice Cardozo dissenting), as follows:

" * * * But it is not enough, to establish liability * * *, that the death or injury was accidental in the understanding of the average man— that the result of the exposure 'was something unforeseen, unsuspected, extraordinary, an unlooked for mishap, and so an accident,' see Lewis v. Ocean Acci. & G. Corp., 224 N. Y. 18, 21, 120 N. E. 56, 7 A. L. R 1129. See also Aetna L. Ins. Co. v. Portland Gas & Coke Co. (C. C. A. 9th) 229 Fed. 552, L. R. A. 1916D, 1027—for here the carefully chosen words defining liability distinguish between the result and the external means which produces it. The insurance is not against an accidental result. The stipulated payments are to be made only if the bodily injury, though unforeseen, is effected by means which are external and accidental. * * *"

■ Moreover, it will be observed that the form limits the physician to a specification of whether the external causes of death were accidental, suicidal, or homicidal. The facts surrounding the decedent's fall obviously eliminated suicide and homicide. The only cause which remained was "accident", and it is apparent that such a "Hobson's choice" would not permit the physician to make any other. Nevertheless, there are casualties or mishaps which might have brought about the decedent's fall, which, although they might, in popular

parlance, be called accidents, would not be classed as accidents within the purview of the insurance policies in suit. We cannot approve the admission of the death certificate here, as proof—even prima facie—that the death of the insured resulted solely from bodily injuries effected directly and exclusively by external, violent, and accidental means, or even as proof of an accidental fall. As we construe the certificate, so far as it relates to the cause of insured's fall, it recites, not the physician's statement that the fall was due to an accident within the terms of the policies or otherwise, but rather that, as between accident, suicide, or homicide, the physician selected "accident" as being the preferable term. Such being our view, we are of the opinion that, in receiving the death certificate in evidence as prima facie proof of the "fact" that the insured suffered an accidental fall, the trial court erred.

■ Under those circumstances, the state of the evidence was such, when plaintiff rested his case and defendant interposed a motion for involuntary nonsuit, that the court should have allowed such motion. However, as it did not do so, and the defendant proceeded to put in its evidence, we address ourselves to the question of whether or not there was other evidence of accident than the recitals of the death certificate, sufficient to carry the case to the jury. In this connection we shall, in accordance with approved practice, consider the other evidence in the light most favorable to the plaintiff.

Dr. J. O. Van Winkle, a ward physician of the Oregon State Hospital, who had medical supervision over the ward in which the insured was a patient, testified for plaintiff that he became connected with the hospital October 15, 1942, and that he visited all of his wards

every day. Prior to the time of her accident, he found the insured to be suffering from psychosis with cerebral arteriosclerosis. He had no occasion to observe whether she walked every day during the month of March, 1943, since his attention was not called to her as needing attention. He had to care for eighty patients, in eighteen wards, and could not take the time to examine each of them, unless his attention was particularly called to them. He last saw the insured two weeks prior to her injury. Interpreting an x-ray photograph of the patient's fractured femur, he testified that the break was about as close to the body as possible, and that, therefore, the shock was considerable. A fractured hip, he said, is considered a serious injury, and is accompanied by systemic shock. Such shock can be fatal. He was not notified at any time before March 12, 1943, that Mrs. Seater had fallen, or was in the habit of falling. The mental psychosis affected her physical being so that she was in a state of depression most of the time. The psychosis is produced by the effect of the arteriosclerosis, which shuts off the blood supply from certain parts of the brain, causing a physical defect, which is manifest by nervousness, paralysis, and some other symptoms. However, Mrs. Seater was not paralyzed. She did not walk as briskly as she did when she was younger or in the best of health, but she was not infirm sufficiently to prevent her from walking about the ward or even from doing minor duties. She was mentally infirm to a very marked degree. The arteriosclerosis which she had affects the nervous system indirectly. It affects the heart of the nerve system and it affected her reflexes. It causes a lack of coordination at times, and at times a lack of ability to have full control of the muscles. In periods of depression, her reflexes would be decreased and, in periods of excitement, increased.

It would be hard to predict exactly what her physical control would be at any particular time, depending on whether she was in a depressed or hyperactive period. In a depression it very definitely decreased her ability to get around. Likewise, in a hyperactive period, it would decrease her efficiency as far as handling herself was concerned. The doctor did not know whether she was in a depression or in a hyperactive period just before she fell. When in a period of depression, she would not necessarily be more likely to fall if she tried to walk. It could be that she would be more likely to fall. A break in the neck of the femur is not necessarily followed by death. In people from sixty years on, the mortality rate is probably twenty per cent. One having arteriosclerosis would have a worse chance of surviving a broken hip. The fact that Mrs. Seater had arteriosclerosis made her chances of recovery less in a minor degree. He did not think that the type of arteriosclerosis which she had had any effect upon her ability to sustain a shock and recover from a broken hip. It is a very frequent occurrence for a person past sixty to break the neck of the femur. In many cases persons beyond sixty years of age break the neck of the femur without falling at all. In a limited number of cases the hip breaks and then they fall. He did not think that a person with arteriosclerosis is much more likely to sustain a broken hip in the neck of the femur. A large percentage of persons having arteriosclerosis do not develop a hardening of the bone so that it is easily breakable. A number of individuals past sixty have arteriosclerosis. It is quite common. There would be no way to determine how long such a person as Mrs. Seater might have lived, but there was no reason why she should not have lived one month, five months or twenty years.

Eva Gilkison testified for plaintiff that she had known Mrs. Seater for about ten years, and that in 1935 she lived with the Seaters for a while. While Mrs. Seater was in the Oregon State Hospital, the witness went to see her every week or two, and thought that she saw her about a week before she was injured. She walked around very well. The witness walked with Mrs. Seater through the halls. She usually took hold of the witness's arm when she walked, but did not need any assistance. Both in the hospital and at home, she walked without any assistance, and walked a great deal. The witness thought that Mrs. Seater got around at the hospital as well as she did before.

The plaintiff, Robert A. Seater, testified that he saw his wife about two days before the accident. The floors in the ward were "slick enough", because they waxed them every two days. His wife walked about the same as she ever did. He could not see any difference. Two days before the accident, she was walking around. After the accident, Mrs. Gilkison and he visited Mrs. Seater, and she was in very bad condition. She couldn't talk, and could hardly move. He tried to talk to her, but she couldn't answer. He could not say whether she was conscious. The floor in the ward was inlaid linoleum. Mrs. Seater did not wax the floor. She was unable to. The other girls in the ward always waxed it. The nurse would sprinkle the wax on and the girls would rub it down. Before she got hurt, Mrs. Seater walked "just as good as I did". She never fell or stumbled in his presence. No one ever told him that she fell.

For the defendant, Myrtle Moses testified that she had been an attendant at the Oregon State Hospital for two years. Mrs. Seater was in her ward. She

had sixty-three patients in the ward. She was the attendant in Mrs. Seater's ward during the entire time the latter was there, except for nine days during the month of February. Mrs. Seater did not walk very well. She quite frequently would become overbalanced and fall. She walked as a child learning to walk. She fell frequently. She fell shortly before the time it was claimed that she broke her hip. Witness had seen her fall on different occasions, but did not see her fall on March 12th. She heard the commotion caused from the fall. Mrs. Seater fell in about the center of the hall. She was coming from the bathroom. There were no chairs or anything around. Just an ordinary floor. Mrs. Seater did not respond when she was talked to other than a chatter. You could not depend on her. She wouldn't come when you called her, and she didn't answer her name. She was physically affected by her disability. The witness thought that she reported to Doctor Van Winkle that Mrs. Seater was falling. Mrs. Seater slept ''in restraint''. The floor in the ward is smooth concrete. It was waxed once a month. It was not slick but was smooth. It is not what you would call a ''glazed'' floor, but a nice ''well-kept-up'' floor. The witness thought that Mrs. Seater cried out, or probably made a noise, when she fell. She did not think that she herself had ever slipped on the floor.

Dr. Homer D. Rush, for the defendant, testified that generalized arteriosclerosis means that type of hardening process of the blood vessels throughout the body. Answering a hypothetical question, he testified that, if such a patient had been confined to the Oregon State Hospital, did not respond when spoken to, did not know who she was, and walked like a baby learning to walk, he would assume that the arteriosclerosis

that involved the nervous system was very extensive. If one has generalized arteriosclerosis, so that the nervous tissues are not behaving normally, it means that the centers that control locomotion are impaired; therefore, there would not be coordination in walking, certain muscular groups would not respond normally, and, since the equilibrium would be upset, one would not be stable on her feet, would be unable to walk in a normal manner, and, therefore, would be subject to falling and swaying. In a person with those symptoms, a fall would not be an unexpected event. It would be quite the expected thing. Arteriosclerosis, generalized to the extent mentioned, would have an effect upon the individual's ability to respond after a broken hip, because she would be more subject to shock, and an individual with that degree of arteriosclerosis would have an increased risk of twenty-five to forty per cent above that of a normal person of overcoming the shock of a break of the hip. A fracture of the hip, such as Mrs. Seater sustained, is not "terribly uncommon" in persons over sixty years of age. It happens reasonably frequently. In an ordinary individual, one would not expect a break in the neck of the femur to cause death, but when one had generalized arteriosclerosis to the extent Mrs. Seater had, then the chance would be much greater that she would not survive. Arteriosclerosis is ordinary in persons upwards of sixty years of age. It is relatively uncommon for a person over sixty-two years, who is normal in other respects, to die as a result of a fractured hip. One having arteriosclerosis generalized, and demonstrating the mental and physical symptoms Mrs. Seater had, would be more apt to do herself bone injury than a normal individual. Sometimes, persons who have reasonably extensive arteriosclerosis sustain

a fractured hip without any slip or misstep, and then the patient falls. It is a possibility that Mrs. Seater might have broken her hip before she fell. One could have osteomosis (?) or osteomalation (osteomalacia?), so that the neck of the femur could break from the mere weight of the patient. From the x-ray, however, the witness found no osteomyelitis. It showed a normal type of bone one would expect in a person of sixty.

The defendant introduced in evidence a record of the Oregon State Hospital showing the clinical history of Mrs. Seater's case. This record stated, among other matters: "Patient shows complete mental confusion, loss of memory and disorientation. DIAGNOSIS: * * * Psychosis with cerebral arteriosclerosis. Mar. 29, 1943: Patient died this date at 11:45 A. M. of fracture of the right hip. Other conditions arteriosclerosis generalized."

■■ As we have stated, none of the witnesses saw Mrs. Seater fall. It is true that there was testimony, by the plaintiff himself, that the ward floors "were always slick enough because they waxed them every two days", but Mr. Seater visited the hospital only once a week, and the hospital attendant testified that they were waxed only once a month. There is no evidence that any one else ever slipped on those floors. Beyond question, the evidence established that Mrs. Seater was seriously deranged mentally, and was afflicted with a considerable degree of generalized arteriosclerosis. Whether or not this physical condition caused her to lose her balance and fall, it is impossible to say. Under the evidence, no one could do more than speculate upon the cause of her fall. Nevertheless the plaintiff, in order to make his case, was required to prove that the insured's death resulted solely from bodily injuries

effected directly and exclusively by external, violent and accidental means. *Bertschinger v. New York Life Ins. Co.*, 166 Or. 307, 111 P. (2d) 1016; *Dondeneau v. State Ind. Acc. Comm.*, 119 Or. 357, 249 P. 820, 50 A. L. R 1129; *Kendall v. T. P. A.*, 87 Or. 179, 169 P. 751. In *Lederer v. Metropolitan Life Ins. Co.*, 135 Pa. S. 61, 4 A. (2d) 608, the insured was found dead on the floor of her kitchen. The gas-jet of the stove was open, and a pot had boiled over, extinguishing the flame. No one saw her fall. On cross-examination of the beneficiary as a witness, it developed that the insured had had two or three fainting spells prior to the occasion in question. The trial court directed a verdict for the insurance company. Judgment on the verdict was affirmed on appeal, the court holding that the only logical conclusion from the facts was that the insured's physical infirmity (that is, her susceptibility to fainting) was the cause of her demise. The evidence here indicates that there was a probability that Mrs. Seater's mental or physical ailments, or both, were the cause of her fall. It cannot be assumed, merely because she fell, that the fall was an accident. Had there been any evidence at all of accidental falling, the question would be one for the jury to determine. As we view the record, however, submission of the case to the jury was an invitation to guesswork.

The testimony of plaintiff's own witness, Doctor Van Winkle, with respect to Mrs. Seater's occasional lack of coordination and lack of ability to have full control of her muscles, tends to corroborate the testimony of Myrtle Moses, the hospital attendant, that, while in the hospital, Mrs. Seater frequently fell. There was no proof whatever of any reason why she fell, save for the suggestion, based upon plaintiff's own testi-

mony, that the floor of the ward was dangerously slippery. This, in itself, under the circumstances, was not, in our opinion, sufficient to permit the submission of the case to the jury. Any finding by the jury that she slipped and fell because the floor was slippery necessarily would be based upon pure speculation.

The cases cited by the respondent upon this point are distinguishable. In Collins v. Casualty Co. of America, 224 Mass. 327, 112 N. E. 634, L. R. A. 1916E, 1203, the insured, in walking from his office to a coal bin to get some coal, slipped, fell, and ruptured himself. It was proved that he had a predisposition to rupture. He underwent a surgical operation for the repair of the rupture, and died a month later. The defendant insurance company contended that the insured's predisposition to rupture was the cause of the injury, and that, therefore, his death did not result from accidental means, independently of all other causes. The court held that, under the evidence, the jury were warranted in finding that the predisposition to rupture was not the cause of the accident. It is to be observed, however, that the facts there were entirely different from those in the case at bar, in that there was definite evidence that the insured slipped and fell, while here there is no evidence that the insured slipped, tripped, or otherwise was accidentally caused to fall. In *Dondeneau v. State Ind. Acc. Comm.*, supra (119 Or. 357, 249 P. 820, 50 A. L. R. 1129) this court commented: "If the respondent had slipped and fallen, thereby sustaining an injury, it would not be denied that such injury was caused by accidental means." This case is cited by the respondent, but it does not appear to be in point, because the quoted comment assumes a slipping and falling, and not a mere unexplained falling.

In *McKay v. State Ind. Acc. Comm.*, 161 Or. 191, 87 P. (2d) 202, an action to collect compensation for the death of a workman covered by the workmen's compensation act, there was evidence indicating that, in the course of his work, he sustained a severe electric shock. An hour or more later, he started, alone, in an automobile, for his home in Portland, a distance of forty miles. After traveling about twenty-eight miles, his car, for no apparent reason, suddenly veered sharply from its course, left the highway and came to a stop in a ditch. Decedent was thrown out of the car, and received a head wound sufficiently severe to have caused his death. A witness saw the accident and went for help. When he returned to the scene, he found that the injured man was dead. It was the plaintiff's theory that the cause of death was the electric shock which decedent had received earlier in the day. The defendant contended that the proof was insufficient to establish that theory as a fact. Expert testimony showed that the effects of electric shock may vary greatly with different individuals. Two of the experts testified for the plaintiff that, in their opinion, heart fibrillation, induced by electric shock, was the probable cause of death, and that decedent either had died at the wheel or had collapsed and so lost control of his car. One of them, when asked on cross-examination whether it was his testimony that the electric shock caused the decedent to go off the highway testified: ''I can't say whether it did or did not. It would be merely an assumption. It is just as easy to assume one thing as it is another.'' There was evidence that sometimes automobiles unaccountably leave the highway, with fatal results to the drivers, that men of decedent's age (fifty-six), even though they seem to be in good health, are subject to be stricken with cerebral hemorrhage or

coronary thrombosis, and that drivers of automobiles sometimes fall asleep at the wheel. Also, mechanical defects are occasionally the cause of such accidents. This court said that, in the absence of testimony of medical experts as to the probable cause of death, no one would contend that any one of the numerous possible causes presented could be seized upon as more likely than another. A jury may not be permitted to speculate on the cause of a death or injury. The medical experts assumed that, because the decedent sustained an electric shock, he came to his death, and, because he died, the electric shock must have produced an injury to his heart capable of causing death or collapse. This, said the court, was not reasoning from cause to effect, but reasoning in a circle. While a judgment may be based upon circumstantial evidence, nevertheless our statute forbids the basing of one inference upon another. We said:

"  *  *  *  as between two possible causes of decedent's death, no evidence has been produced which makes one cause appear as more probable than the other, or enables the triers of the facts to do other than guess at the solution of the mystery. In that situation the plaintiff necessarily must fail."

Under the facts in the case at bar, it is not more probable that the insured slipped and accidentally fell than that she fell by reason of her mental and physical disabilities.

Counsel for respondent suggest that there were present in the evidence "the ingredients for the fracture of the hip  *  *  *  'A slick floor, waxed regularly; an elderly lady.' " They should have added: "A clinical history of mental confusion, loss of memory and disorientation, with diagnosis of psychosis with cere-

bral arteriosclerosis, and other evidence of mental derangement and physical incapacity, and of frequent falling.''

Respondent cites *New York Life Ins. Co. v. Hatcher,* 115 F. (2d) 52. In that case the insured had arteriosclerosis and very high blood pressure. He was sixty-five years old. He fell on a polished floor upon which a rug had been placed. There were no eye-witnesses. The court held that the jury were properly permitted to determine, under the evidence, whether or not the insured accidentally fell. That there was present in that case evidence such as is lacking here, however, is indicated by the opinion of the court, from which we quote:

" * * * He was walking with his cane in his left hand, his left leg being the short and weak one, and if the cane was placed on the rug it would easily slip and cause him to fall. The rug was found to be pushed together as though this had happened. The rug, the head injury, and his position on the floor as indicated by the blood, make just such a picture as such a slip and fall would make. * * * A bodily injury thus resulting would be due to an external, violent and accidental cause.''

In *Silverstein v. Metropolitan Life Insurance Co.,* 254 N. Y. 81, 171 N. E. 914, cited by respondent, the evidence was that the insured, while lifting a milk-can into an ice-box, slipped and fell, the can striking him on the abdomen. The question for determination was whether the insured was accidentally injured, within the terms of the insurance policy, or died by reason of the fact that the injury aggravated a diseased condition with which he had been afflicted. So far as the point under consideration is concerned, it is not apparent that this case has any relevancy, for the reason that

the evidence showed that, while lifting the milk-can, the insured slipped.   The slipping was the accidental cause of the fall.

In the instant case, we think that the court should have directed a verdict for the defendant.   The evidence was legally insufficient to have been submitted to the jury upon the question of whether or not the injury which resulted in the death of the insured was caused by accidental means within the provisions of the policies.   The judgment is reversed, and the cause is remanded with directions to enter judgment for defendant.

Petition for rehearing denied June 19, 1945

## ON PETITION FOR REHEARING
(159 P. (2d) 826)

Before BELT, Chief Justice, and ROSSMAN, KELLY, BAILEY, LUSK, BRAND and HAY, Associate Justices.

HAY, J.

The plaintiff-respondent has petitioned for a rehearing, upon the grounds that the court erred in holding (1) that it cannot be assumed, merely because Mrs. Seater fell, that the fall was an accident, (2) that submission of the case to the jury was an invitation to guesswork, and (3) that there was insufficient evidence of the cause of death by accidental means to submit the case to the jury.

■ It will be remembered that the policies of insurance upon which the action was based provided that the insurer would pay double indemnity if the death of the insured should result solely from bodily injuries effected directly and exclusively by external, violent, and accidental means, but that such double indemnity would not be payable if death resulted directly or in-

directly from illness or disease of any kind, or from physical or mental infirmity. The complaint alleged that the insured died from bodily injuries within the terms of the policies. On these matters the plaintiff had the burden of proof.

Respondent contends that there is a presumption that the deceased did not voluntarily inflict the injury upon herself, and that the injury was due to an accident. We assume that what is meant by this contention is that, upon proof that the deceased died of bodily injuries effected directly and exclusively by external and violent means, it might be inferred by the triers of the fact that such injuries were the result of an accidental cause. We have considered the cases cited by respondent in support of his petition, and we think that, so far as they are pertinent, they are distinguishable from the case at bar.

*Beimdiek v. New York Life Ins. Co.,* (Mo. App.) 183 S. W. (2d) 379, was an action for double indemnity benefits under two life insurance policies. The petition alleged that insured died from a fractured hip, the result of an accidental fall sustained by him in his bedroom. Insured was sixty-nine years of age and had been a salesman for an oil company. He died May 15, 1942. Up until 1940 or part of 1941, he had been quite active in his work. In the latter part of 1941, however, his activities became curtailed because of physical disabilities which rendered walking difficult. On the occasion of his fall there were no eye-witnesses, but his wife testified that she "heard a loud bump or thud". She went immediately into his bedroom and found insured sitting on the floor with his back against a wardrobe. In answer to her inquiry as to what had happened, he stated that he had tried

to grab the footboard of the bed and had missed it. There was testimony that, beginning in October, 1940, he had experienced a little trouble with his legs, which resulted in a "sort of a slow, little undecided" manner of walking. The medical evidence indicated that he was afflicted with a progressive lateral sclerosis of the spine, and degenerative changes in the spinal cord due to arteriosclerosis. He suffered a fractured hip in the fall, and died ten days later, apparently of "terminal" pneumonia.

We think that the distinguishing features between the Beimdiek case and the one before us are these: While Beimdiek had arteriosclerosis, which apparently caused him to walk slowly and in an undecided or hesitant manner, there was nothing in his case history to indicate that, because of his physical ailments, he was in the habit of falling or had ever fallen. Moreover, the fact that he inferentially attributed his falling to his having unsuccessfully tried to grab the footboard of the bed, was some evidence that his fall was accidental. In the case at bar, however, the evidence showed that Mrs. Seater, during the period while she was confined in the State Hospital, was subject to falls, and, therefore, that her falling upon the occasion when she broke her hip was not an unexpected occurrence but rather one that might reasonably have been expected to happen.

*Wilkinson v. Aetna Life Ins. Co.*, 240 Ill. 205, 88 N. E. 550, 25 L. R. A. (N. S.) 1256, 130 Am. St. Rep. 269, is cited to the effect that, where the evidence shows that an insured has suffered an injury which has caused death, and there is no proof in the record from which it can be determined whether the injury was accidental or self-inflicted, the presumption is that

it was accidental. This, upon the facts of the case, was an application of the so-called presumption against suicide, which is available and is frequently made use of in insurance cases in which the insurer defends upon the ground that the insured committed suicide. (See *Wyckoff v. Mutual Life Ins. Co.,* 173 Or. 592, 147 P. (2d) 227.) Other cases cited by respondent which are illustrative of this presumption are *Jenkin v. Pacific Mut. Life Ins. Co.,* 131 Cal. 121, 63 P. 180; *Travellers' Ins. Co. v. M'Conkey,* 127 U. S. 661, 8 S. Ct. 1360, 32 L. Ed. 308; *New York Life Ins. Co. v. Gamer,* 303 U. S. 161, 58 S. Ct. 500, 82 L. Ed. 726, 114 A. L. R. 1218; *Ryan v. Met. Life Ins. Co.,* 206 Minn. 562, 289 N. W. 557. Such cases are not, in our opinion, in point under the circumstances of the case at bar.

The respondent cites *Kundiger v. Metropolitan Life Ins. Co.,* 218 Minn. 273, 15 N. W. (2d) 487. That was an action for double indemnity under two industrial life insurance policies. The insured was fifty-one years of age and had been employed for several years as a laborer in a paper-mill. His work involved the trucking of heavy bales of paper and the loading and unloading of box cars. He was afflicted with leukemia, an incurable disease. Notwithstanding his affliction, however, he continued in his employment until a week before his death. He arrived home one night apparently suffering considerable pain and, instead of eating lunch, as was his custom, went to bed immediately. During the night he awakened his wife, who saw that his neck was swollen and that its left side was black and blue. In the morning she observed that the swelling had considerably increased, that the black and blue area was larger in extent, that insured's neck was stiff, that he was unable to move his head, and that

he had some difficulty in speaking. He died about a week later. The provisions of the policies with respect to liability for double indemnity were similar to those in the present case. We quote from the opinion of the court:

> "Plaintiff was unable to prove when or where her husband sustained the injuries causing his swollen neck, the black and blue marks, or the scratches observed on his body, but such proof was not indispensable. The accidental origin of his injuries will be presumed without proof of a mishap. 'Given death from violence, without more, decision must be that it was accidental.' Ryan v. Metropolitan L. Ins. Co., 206 Minn. 562, 567, 289 N. W. 557, 560; Konschak v. Equitable L. Assur. Society, 186 Minn. 423, 243 N. W. 691."

Assuming, without deciding, that in a case where the evidence shows that an insured met his death from external violence, "without more", an inference might be drawn that the fatal injury was the result of accidental means, we think that no such inference is permissible from the evidence in the case now before us. In *Prudential Ins. Co. v. Van Wey,* (Ind. App.) 56 N. E. (2d) 509, cited by respondent, the factual situation was similar to that of the instant case, except that there the insured was perhaps more seriously afflicted with physical ailments than was Mrs. Seater. This was a decision of the appellate court of Indiana. The insured had suffered from chronic nephritis, hypertension, and coronary sclerosis. She was sixty-two years of age, and was more or less bedfast. On the occasion of her injury, she had arisen from her bed and entered her bathroom. The level of the bathroom floor was one step higher than that of the bedroom floor. She fell in the bathroom, near the step. No one saw her fall,

but her daughter heard the noise and went to her assistance. The court, relying upon a statement in 29 Am. Jur., Insurance, section 1443, stated it to be the general rule "that in an action on a policy insuring against death caused solely by external, violent, and accidental means, * * * where death by unexplained, violent, and external means is established, a presumption is thereby created or prima facie proof is thereby made of the fact that the injuries were accidental, without direct and positive testimony on that point, since the law will not presume that the injuries were inflicted intentionally by the deceased or by some other person." It held that, there having been no direct or positive evidence in explanation of the fall, it was bound in law to conclude that the fall was accidental. The case would be authority for respondent here but for the fact that it was reversed by the Indiana Supreme Court upon the very holding upon which respondent relies. (*Prudential Ins. Co. v. Van Wey,* 59 N. E. (2d) 721.) Because the reasoning of the supreme court lends support to our holding herein, we quote from the opinion as follows:

"While ultimate facts may be established by direct or circumstantial evidence and by inferences properly drawn from such evidence, yet neither courts nor juries have any right to presume any fact in issue which they are called upon to determine. Kaiser v. Happel, 1941, 219 Ind. 28, 33, 36 N. E. 2d 784; Baltimore & Ohio R. Co. v. Reyher Adm'x, et al., 1939, 216 Ind. 545, 549, 550, 551, 24 N. E. 2d 284. Therefore, the decision in this case cannot be predicated on mere presumption that because there was a fall that such fall was effected through accidental means.

"That ultimate fact must be established by evidence or proper inferences to be drawn from evi-

dence. A finding as to this fact cannot be based upon conjecture, speculation or guess. Orey v. Mutual Life Insurance Company of New York, 1939, 215 Ind. 305, 309, 19 N. E. 2d 547; J. C. Penney, Inc., v. Kellermeyer, 1939, 107 Ind. App. 253, 264, 19 N. E. 2d 882, 22 N. E. 2d 899, and the mere possibility that it may be true will not properly sustain an inference that it is true. New York Central R. Co. v. Green, Adm'x, 1938, 105 Ind. App. 488, 496, 497, 15 N. E. 2d 748; Moorman Manufacturing Company et al. v. Barker, 1941, 110 Ind. App. 648, 659, 40 N. E. 2d 348.

"In this case the direct evidence simply shows a woman who was in such state of health that she was weak and subject to dizzy spells and was tottery when she walked. This woman went to her bathroom, which involved walking up a step or two, and fell. All that the direct evidence shows is that she fell and broke her hip. There was no direct evidence of what caused her fall.

"The circumstantial evidence is such that the court could not properly draw the inference either that the fall was caused by dizziness and her tottery physical condition or that it was caused by slipping or stumbling or anything else that might fall within the definition of accidental means. To choose either of these alternatives would mean resort to speculation and conjecture."

Our statement, that it cannot be assumed, merely because Mrs. Seater fell, that the fall was an accident, must be read in the light of its context, and not as an isolated comment. The context was that the evidence indicated that it was probable that Mrs. Seater's mental or physical ailments, or both, were the cause of her fall; that she was seriously deranged mentally, and was afflicted with a considerable degree of generalized arteriosclerosis; and that, while she was in the hospital, she frequently fell. We are satisfied that our state-

ment was warranted, and was a correct exposition of the law as applied to the facts in evidence.

The two remaining grounds assigned upon the petition are characterized by petitioner's counsel as following the first assigned ground in logical sequence. We agree that they do so, and, having found against respondent upon the first ground, we are constrained logically to find against him upon the other grounds also.

It is interesting to note that respondent, in oral argument before this court, relied exclusively upon the death certificate for proof that Mrs. Seater's fall was accidental. This is apparent from the following colloquy between court and counsel. "Judge Bailey: Is there any testimony other than this certificate that the fall was accidental? Mr. Galton: No, *we either stand or fall on the certificate.*"

The petition for rehearing is denied.