Argued June 13, reversed August 29, 1950

IN THE MATTER OF THE ESTATE OF
LUCILLE CRUSON
STATE LAND BOARD *v.* LONG, ADM'R, ET AL.
221 P. (2d) 892

*Cecil H. Quesseth,* Assistant Attorney General, of Salem, argued the cause for appellant. With him on the brief were George Neuner, Attorney General, and Fred A. Miller, Deputy Attorney General, of Salem.

*Orval N. Thompson,* of Albany, argued the cause for respondents. On the brief were Weatherford & Thompson and Merle A. Long, all of Albany.

Before Lusk, Chief Justice, and Belt,* Rossman, Hay and Latourette, Justices.

ROSSMAN, J.

This is an appeal from an order in the nature of a decree of the Circuit Court which overruled objections presented by the State to the final account of Merle Long, administrator of the estate of Lucille Cruson, deceased, and dismissed a petition filed by the State for the escheat of the decedent's estate. The respondents, in addition to Long, are G. F. Cruson, Jr., administrator of the estate of G. F. Cruson, Sr., deceased, G. F. Cruson, Jr., individually, and Jacqueline Dagman. G. F. Cruson, Sr., and Lucille Cruson, both now deceased, were husband and wife. G. F. Cruson, Jr., and Jacqueline Dagman were, respectively, son and daughter of G. F. Cruson, Sr., by a prior marriage. G. F. Cruson, Sr., and his wife, Lucille, were killed October 26, 1947, when an auto driven by the husband, in which his wife was a passenger, left highway No. 20 and, after plunging over a cliff, fell upside down upon

---

* Died August 6, 1950.

a ledge and then toppled over into the South Santiam river. The catastrophe occurred near Cascadia.

The final account of the administrator of the estate of Lucille Cruson states that "the name and age of the sole heir of the decedent is G. F. Cruson, Sr., husband, aged 62 years, that since the death of said Lucille Cruson the said G. F. Cruson, Sr., died intestate." The objections filed by the State, acting through its Land Board, averred:

"Said G. F. Cruson, Sr., did not survive the decedent, Lucille Cruson, and was not the legal heir of said decedent.   *   *   *   Your petitioner is informed and believes, and therefore asserts, that Lucille Cruson died intestate and without legal heirs and that, upon her death, her estate escheated to the State of Oregon."

The respondents filed answers to the State's objections and thereafter a trial occurred upon the issues. It was the contention of the State at the trial that husband and wife died simultaneously. The respondents contended that the husband survived his wife. Oregon Laws 1947, chapter 527, amended § 2-407, O. C. L. A., by deleting from it subsection 41 which created presumptions borrowed from the Continental law concerning survivorship in instances where two persons perished in the same calamity. Oregon Laws 1947, chapter 555, which is the Uniform Simultaneous Death Act, says, in part:

"Where the title to property or the devolution thereof depends upon priority of death and there is no sufficient evidence that the persons have died otherwise than simultaneously, the property of each person shall be disposed of as if he had survived, except   *   *   *."

The State depended upon the statute just quoted to

establish its claim. The respondents relied upon evidence which we shall presently review. At the close of the trial the court entered the attacked judgment order; it holds:

"Lucille Cruson died on October 26, 1947, and was survived by G. F. Cruson, Sr., her husband and sole heir at law, and that G. F. Cruson, Sr., thereafter died and left as his sole heirs at law a son and daughter, G. F. Cruson, Jr., and Jacqueline Dagman."

The State presents the following assignments of error:

"The Court erred in holding that Lucille Cruson, deceased, was survived by her husband, G. F. Cruson, Sr.

"The Court erred on examination of witness Glenn Huston, Linn County Coroner, in failing to sustain appellant's objection to the following question [Tr. p. 28]:

" 'Q. Well, from your experience as a mortician now, did you form an opinion as to which one of these persons died first?' "

Ancillary to the assignments of error, the State contends (1) the burden of proof was upon the respondents to prove that the husband survived his wife; (2) this proceeding is governed by equitable principles; (3) the term "sufficient evidence" which appears in Oregon Laws 1947, chapter 555, means the amount of proof which satisfies an unprejudiced mind; (4) death certificates are prima facie evidence of the facts recited by them; (5) the evidence did not show that the husband survived his wife; and (6) a witness should not be permitted to give his opinion if he can accurately state the facts which he observed.

■ We shall first take note of the second of the above-listed contentions. The course taken by the State

in this proceeding was evidently patterned upon the procedure delineated in *In re Wakefield's Estate,* 161 Or. 330, 87 P. 2d 794, 89 P. 2d 592. That decision sustained the regularity of the procedure and deemed the cause as "in equity." It said: "On appeal, this court is not bound by the findings of the trial court." See, to same effect, *In re Anderson's Estate,* 157 Or. 365, 71 P. 2d 1013. Accordingly, it is our duty to analyze the evidence and try the cause de novo.

It is conceded that G. F. Cruson, Sr., and Lucille Cruson were husband and wife; that G. F. Cruson, Jr., and Jacqueline Dagman are the son and daughter of G. F. Cruson, Sr., by a prior marriage; that G. F. Cruson, Sr., and his wife, Lucille, lost their lives October 26, 1947, when an automobile driven by the former plunged from a precipice adjacent to highway No. 20 near Cascadia; that after their bodies were found it was discovered that the skulls of both husband and wife were fractured; that no one except the decedents saw the fatal mishap; that following the latter no one saw the unfortunate victims until after life had left them; that no autopsy was performed upon their remains; that no medical witness testified in this case; and that no evidence was presented which shows whether or not the cause of death of either husband or wife was drowning. The respondents do not dispute evidence presented by the State which shows that the wife died intestate and without heirs at law, unless her husband survived her. The State does not take issue with testimoney which described G. F. Cruson, Sr., as 62 years of age, six feet one inch tall, weight 175 pounds, and "in very good physical health." Nor does it dispute other testimony which showed that Mrs. Cruson was about 55 years of age, that she weighed

not more than 100 pounds and that a short time prior to the disaster she was the victim of a severe attack of ill health.

Three persons were in the automobile when it carried its occupants to their death. Since the third occupant, one Crandall, had no bearing upon the issues before us, we shall mention him no further.

According to a police report which is before us as an exhibit, the Crusons were last seen alive at 2:00 a. m., October 26, 1947, when they left a dance hall. Mr. Cruson was driving their car. The same report, referring to the place where the car left the roadway, says: "It seemed apparent that said Buick was traveling at a high rate of speed and failed to negotiate a curve." That report was made by Officer Everett Hockema, who testified on behalf of the State. The coroner of Linn County, that being the county in which the fatality occurred, acting pursuant to the requirements of Oregon Laws 1941, chapter 130, § 28, prepared and signed death certificates concerning the death of both husband and wife. Each states that death occurred at 2:15 a. m., October 26, 1947.

The highway in the vicinity of the casualty is not level and makes a turn. The Cruson car was traveling upgrade, that is, opposite to the current of the river. The turn in the road was toward the car's right. To the left of the pavement is a shoulder, and beyond the latter, but 35 feet lower, is the South Santiam river. Descending 35 feet from the shoulder to the water is a rocky cliff which is so steep that it is virtually precipitous. Large boulders and rocks line the shore of the swift-flowing river.

No one knew that a disaster had occurred until about 9:00 a. m., October 26, 1947. A half hour later

there came to the scene A. E. Nesbitt, H. Williamson and F. M. Morrison, employees of the United States Forest Service. The two first mentioned were friends of the Crusons. A few minutes later, Glenn Huston, Linn County coroner, came to the place of the misfortune and shortly the four were joined by Everett Hockema, the aforementioned State Police officer. All five of the persons testified. There is no conflict in their testimony except in details which are not controlling. All five did not testify to each of the particulars which we are about to relate.

The Cruson car, upon leaping from the roadway, overturned in midair and descended upside down upon a rocky ledge near the water. After landing upon its top it tipped over, or rebounded, and fell right side up in the water. Hockema described the damage inflicted upon the ledge by the weight of the careening car. When the automobile came to rest in the water, it was facing in the same direction in which it had traveled, that is, upstream. The top of the car, especially the forward part, was badly crushed and crumpled. The hood was missing, and all of the glass, with the exception of the rear window, was shattered. One of the witnesses swore that both left-side doors were open. According to him, the rear one was torn from its lower hinge. Another witness thought that both of the front doors were open, and one believed that all doors were open. Some of the water of the river swirled around the car and some flowed through it.

The automobile was virtually submerged in the river and only a small part of the rear of the top protruded above the surface. The depth of the water around the car was five and one-half feet; the stream

was rough and swift. The distance from the car to the near bank was about twelve feet. Here and there near the shore were small placid areas, but the water in the vicinity of the car flowed with such force that two of the witnesses thought that no one could have walked through it. A third expressed a belief that anyone who tried to do so "wouldn't have landed straight across from where he started."

Mr. Cruson's body was found a few minutes after the three forestry men arrived at the scene. It was almost completely submerged in water and lay five or six feet upstream from the car in a sheltered place. One witness termed the spot "a small eddy" and another, in describing it, said "it couldn't hardly be classed as an eddy because the water was hardly swirling at all; it was a dead pocket."

Mrs. Cruson's body was not found until about two hours after her husband's. Hers was discovered a quarter of a mile or more downstream from the car and about ten feet from the shore. It was lodged between two rocks and a root. At that point, according to one witness, the stream flowed "in a very heavy current." Mrs. Cruson's body, with the exception of one of her feet, was completely submerged in the water. Her head and the upper part of her body were downstream.

As we said, it is conceded that the skulls of both victims were fractured. In a manner which was, of course, unknown to any of the witnesses, Mr. Cruson had received a jagged wound in his skull which went "through and into the brain." The quoted words were taken from the testimony of Mr. Huston. The wound was "a little ahead of the ear", so that same witness swore, although he could not recall whether it was upon the left or the right side. One of the for-

estry men described the wound as "a small hole that you could put your finger in." Another, referring to it, described it as "very visible; you couldn't avoid it." And still another made use of the phrase "puncture wound." When the body was removed from the water "a slight drainage" from the wound was observed by Mr. Huston. One witness described the oozing substance as light red in color, and another termed it blood. Mr. Huston's unchallenged testimony indicates that the left arm of Mr. Cruson was fractured immediately below the elbow. We quote again from his testimony:

"Q. You think it is possible that Mr. Cruson might have died instantly from the head injury he received?"

"A. I couldn't say."

Mr. Huston, who, it will be recalled, is the coroner of Linn County, reported the extent to which rigor mortis was manifest in the remains of Mr. Cruson. According to him, "There seemed to be quite a bit of rigor mortis in the arms. The rest of his body was quite flexible." He later modified the term "quite flexible" by using the term "more or less flexible." The other witnesses said nothing about rigidity in the arms and found not enough in the other parts of the body to have commanded their attention.

Mr. Huston, referring to Mrs. Cruson's remains, said:

"One leg was broken in two or three places, sort of crushed like.

"Q. What indication was there in the skull?

"A. She had a skull fracture along the side of the head and apparently hemorrhage, hemorrhage on account of the black eye.

"Q. You say a skull fracture—was the skull mashed?

"A. Caved in, that's right.

"Q. Caved in?

"A. Yes, sir.

"Q. You didn't need to be a doctor to see it was mashed in—broken?

"A. That's right. You could take hold of it and hear the bones crush."

Going on, and referring to Mrs. Cruson, he said, "both eyes were blacked and puffed."

Other witnesses, in addition to Mr. Huston, testified that Mrs. Cruson's face above the nose was noticeably black and blue in color. They observed no indications of blood upon her remains and no wounds. Apparently both of her legs were badly broken. Mr. Huston described her body as "just like a board * * * very rigid." All others who mentioned the rigor mortis that they had found in her remains used terms similar to the coroner's. Force was needed to straighten her body. We again quote from Mr. Huston's testimony:

"Q. When does rigor mortis set in with relation to death?

"A. Of course, that varies in different bodies. The exertion prior to death has a lot to do with it. There isn't any fast or set rule to rigor mortis; you can't just put your finger on that because it varies."

Presently he was questioned concerning the two bodies as they lay in his mortuary. The following is taken from that part of his examination:

"Q. What I was getting at, the Court would be interested to know the comparison between the two as to the condition between rigor mortis at that time when you had the bodies together.

"A. That was true; when we moved them from the river, she had more. That will stay for several hours and, of course, after a time your chemical reaction there, it passes off, but it hadn't had time to do that.

"Q. What I mean, was the rigor mortis more pronounced after you got the bodies together in one place?

"A. It was more pronounced in her, which it had been all the way through."

In appraising the significance of the testimony just mentioned, it is important to recall that the wife's body was not found until two hours after her husband's. Possibly the fact that it lay in a part of the stream where the current ran over it with great swiftness may be material. The South Santiam river is a mountain stream and its water is cold.

To complete the statement of the facts, we will now relate the answer given by Mr. Huston, which is the subject matter of the second assignment of error, and some facts incidental to it. Mr. Huston had had no training in any of the medical sciences. He gave his age as 38 and testified that for twenty years he had been a mortician. Over objections of the Attorney General, he was permitted to answer the following question:

"Q. From your experience as a mortician now, did you form an opinion as to which one of these persons died first?

"A. I think my layman [lay mind?] did. As I would see it, on these certificates here, these death certificates we filled, there was nothing important; there was no criminal aspect. We established the time of the accident so we put that on both certificates, but naturally anyone would assume this, that a woman that would probably weigh in the neighborhood of—I don't know what

she weighed, but I would say she didn't weigh one hundred pounds. He was a husky looking man. At least good judgment would say, looking at the injuries, he was hurt more extensively than his wife. Anyone would assume that she would have died instantly, where he could probably, with a head injury and an arm injury, live for some time. That is an opinion, I think, that anyone who saw them would feel.

"Q. That is your opinion?
"A. That would be my opinion.

"Q. Which one, now, survived in your opinion?
"A. Mr. Cruson.

"Q. And could you, from your examination there, fix any number of hours he survived, or minutes?
"A. That is hard to say. I have seen so many cases of accidents, etc., where you can't say. That is a thing that is difficult to say whether it would be a matter of minutes. In that case I would say where he was in the water, it would be a short time; that would be my honest opinion."

Mr. Huston conceded that he did not examine the remains of the Crusons to determine whether either of them had broken necks or backs. He added, "An autopsy would show that." Likewise, since no autopsy had been performed, he, like all others, did not know whether both victims or either died from drowning or some other cause such as heart failure or internal injuries. So far as we can determine from the record, he did not know whether or not all of Mr. Cruson's blood left his body through the deep puncture in his skull. It will be recalled that Mr. Huston answered, "I couldn't say", to a question which asked him whether Mr. Cruson's injuries resulted in instant death. After he had given that answer he was asked, and answered, as follows:

"Q. Yet you say it might have been possible that Mr. Cruson might have lived a minute or two hours, you don't know that?

"A. No, nor no other man could tell."

Thus, it is clear from Mr. Huston's testimony that he did not know whether Mr. Cruson's injuries snuffed out his life instantly or permitted him to live for a short time.

By reverting to the answer which Mr. Huston made to the challenged question, it will be seen that he said: "Anyone would assume that she would have died instantly." Based upon that assumption, and another assumption that her husband did not die instantly, the witness reached the conclusion that the husband survived his wife. Counsel for the respondents, in their carefully prepared brief, state:

"It is apparent that Mrs. Cruson did not die instantly. The edema around the eyes and face, and the blackened condition, indicates that the heart was beating after the impact and that blood had escaped in the bruised areas under the skin and had turned the skin black. * * * It is evident that in this case Mrs. Cruson because of the blackened condition of her eyes was alive, although unconscious, after the blow she had suffered was inflicted."

Thus we see that the basic assumption ("Anyone would assume that she would have died instantly.") was unwarranted. Since the assumption upon which his conclusion was based was erroneous, it seems that his conclusion lacked a legitimate foundation. Mr. Huston, upon cross-examination, explained that in reaching his conclusion he took into consideration this fact: "Her head injuries were more severe than his." No one can be certain how she sustained the fractures of her skull. In floating down the winding, swift stream amid its

rocks, her head may have struck hard upon many stony surfaces. When her body was found it was lodged head first between two large rocks and a root, where the stream flowed "in a very heavy current." If we are to emulate Mr. Huston and engage in assumptions, we would be tempted to assume that the turbulent stream pounded Mrs. Cruson's head against the rocks innumerable times and thereby contributed to the fractures which Mr. Huston noticed. However, all of that is conjecture.

The above will suffice as a review of the evidence. We omitted mention of many details.

We shall consider first the second assignment of error. It challenged the admissibility of the opinion expressed by Mr. Huston to the effect that the husband survived his wife. Although the ruling which permitted Mr. Huston to give his opinion is attacked by this assignment of error, the respondents' brief cites no authorities to support the challenged ruling which received the opinion. Very likely Mr. Huston was an authority upon dead bodies, but he made no claim to any superior knowledge concerning injuries and the capacity of the human body to resist peril. In fact, the question which asked him for his opinion "as to which one of these persons died first" did not ask him to draw upon any experience which he may have had with injuries, fractured skulls, and physical stamina, but to use his "experience as a mortician." It is not apparent how his experience with corpses could have enabled him to answer the question; in fact, he made no attempt to answer as a mortician. It will be recalled that he began his answer with these words, "I think my layman [lay mind?] did." Then, although the question did not ask him to do so, he stated the reason which

prompted him to enter in the death certificates of both husband and wife the hour of 2:15 a. m. as the time of death. Having given that explanation, he proceeded to answer the question, not as a mortician, but in the capacity denoted by the following phrases which he used, "naturally anyone would assume," "just good judgment would say," "anyone would assume," and "that is an opinion, I think, that anyone who saw them would feel." Thus, it is clear that he did not voice the opinion of an expert, but that of "anyone who saw them," that is, the dead bodies. Presumably, the other witnesses were as well qualified as he to express opinions "as to which of these persons died first." If the discovery of the bodies, the removal of them from the water and an intimate friendship with the persons prior to their death were additional qualifications, then two of the forestry men were even better qualified than Mr. Huston to express opinions.

■ We deem the rule which controls the admissibility of the challenged opinion to be the following:

"The second group of persons to whom the Opinion Rule has to be applied (*ante,* § 1918) includes those who concededly have *no greater skill* than the jury in drawing inferences from the kind of data in question. Such a witness' inferences are inadmissible when the jury can be put into a position of equal vantage for drawing them—in other words, when by *the mere words and gestures of the witness the data he has observed can be so reproduced that the jurors have those data as fully and exactly as the witness had them at the time he formed his opinion.*"

Wigmore on Evidence, 3d ed., § 1924.

■ Mr. Huston gave to the jurors all the data and facts he had. His opinion was inadmissible: *State v. Bar-*

*rett,* 33 Or. 194, 54 P. 807; *Everart v. Fisher,* 75 Or. 316, 145 P. 33, 147 P. 189; and *Wallace v. American Life Ins. Co.,* 111 Or. 510, 225 P. 192, 227 P. 465. The wisdom of the rule which we are applying is well illustrated in this case when one considers the ill-advised opinion which Mr. Huston expressed. A previous paragraph of this decision analyzes his opinion and shows, not only that he based it upon an erroneous assumption, but also that he, like all others, does not know whether the Crusons died from skull fracture, drowning, broken necks or any one of several other possible causes which could have been revealed only by an autopsy. An opinion ventured upon data which is incomplete is guesswork. The State's objection should have been sustained.

We shall now consider the first assignment of error, which, it will be recalled, challenges the holding to the effect that the husband survived his wife.

Prior to its repeal by Oregon Laws 1947, chapter 527, subsection 41 of § 2-407, O. C. L. A., created a series of disputable presumptions based upon "the probabilities resulting from the strength, age and sex" of two persons who perished "in the same calamity." The presumptions were available only if it was "not shown who died first, and there are no circumstances from which it can be inferred." The fifth of the series of presumptions was this: "If one be under fifteen or over sixty years and the other between those ages, the latter is presumed to have survived." Mr. Cruson was over 60 years of age. Mrs. Cruson's age was 55. The common law employed no presumptions of that kind. Survivorship had to be proved. The artificial rules which made up subsection 41 were of Continental law origin: Wigmore on Evidence, 3d ed., § 2532.

If subsection 41 had not been repealed, it would authorize a presumption that Mrs. Cruson survived her husband, provided the record which we have reviewed does not itself show which of the two "died first", and likewise if it reveals "no particular circumstances" from which survivorship can be inferred.

■ Oregon Laws 1947, chapter 555, § 1, quoted in a preceding paragraph, is not a rule of evidence but of substantive law. It says:

"Where the title to property or the devolution thereof depends upon priority of death and there is no sufficient evidence that the persons have died otherwise than simultaneously, the property of each person shall be disposed of as if he had survived, * * * ."

The State, in offering its evidence, presented a certified copy of the death certificate signed by the Linn County coroner pertaining to Mrs. Cruson's death and a similar copy pertaining to Mr. Cruson's death. A previous paragraph of this opinion mentions those certificates. Each entered as the hour of death 2:15 a. m., October 26, 1947. When the two documents were offered, the trial judge sustained objections made by the respondents, but permitted the instruments to be made a part of the record under equity practice. Immediately before the State rested, respondents' counsel addressed the trial court with the statement that a reading of the authorities upon which the State relied convinced him that the certificates were admissible, and that "we withdraw our objection to the exhibits which are the death certificates. Our position goes to the weight of them rather than the admissibility." Thus the documents were received free from objection.

■ Respondents' brief, however, contains this statement: "A death certificate is not prima facie evidence

of the facts stated therein as to time of death or manner of death." It cites *Seater v. Penn Mutual Life Ins. Co.*, 176 Or. 542, 156 P. 2d 386, 159 P. 2d 826.

Oregon Laws 1941, chapter 130, § 11, a part of our Vital Statistics Act under which the two death certificates were prepared, says:

> "Each certificate, as provided for in this act, * * * shall be prima facie evidence of the facts therein stated."

One of the facts stated in the certificates was the hour of death, to-wit, 2:15 a. m., October 26, 1947. The Seater opinion, referring to the provision just quoted, said:

> "We feel we are bound, by the clear terms of the Oregon statute, to hold that it was the intention of our legislature that such certificates should be so received. * * *
>
> "It is competent for the legislature to make a death certificate prima facie evidence of the facts shown therein."

The Seater opinion contains nothing adverse to the death certificates which are before us in this case. It deemed the entry in the death certificate with which that case was concerned immaterial to the issues before the court, and therefore inadmissible. The death certificates now before us show that the deaths of Mr. and Mrs. Cruson occurred synchronously. Therefore, they constituted material evidence. We think that the certificates were admissible to establish that the deaths were concurrent.

When the State rested it had presented (1) the two death certificates, (2) the testimony of officer Hockema which described the marks upon the pavement, the damaged ledge upon which the plunging car fell, the disabled car and the bodies in the water, and (3) evi-

dence showing that unless Mr. Cruson survived his wife, the latter had no heirs at law. All of that evidence showed prima facie that husband and wife perished in a common disaster as commorientes, and that the devolution of the wife's property was controlled by the provision of the Uniform Simultaneous Death Act which we have quoted. At that point the respondents presented their evidence consisting of the testimony of the coroner, G. F. Cruson, Jr., and the three forestry men. G. F. Cruson, Jr., knew nothing about the fatality, but mentioned the age and the condition of health of the two victims.

The respondents contend that husband and wife did not expire at the same moment, that the husband survived his wife and that he was, therefore, entitled to her estate. We shall now undertake to determine upon whom rested the burden of proving those alleged facts.

From Wigmore on Evidence, 3d ed., § 2532, we quote:

"Where two or more persons have perished in the same disaster, there is at common law no presumption of law that either survived the other, or that all perished at the same time. The burden of proving that one survived another will commonly be on any claimant for whom that fact is essential to his own chain of title. If there is evidence from the age, sex or physical condition of the persons who perished, or from the nature of the accident and the manner of death of the parties, which tends to show that some one did in fact survive the others, the whole question is one of fact, * * *."

The following is taken from *Young Women's Christian Home v. French*, 187 U. S. 401, 47 L. Ed. 233:

"The rule is that there is no presumption of survivorship in the case of persons who perish by a com-

mon disaster, in the absence of proof tending to show the order of dissolution, and that circumstances surrounding a calamity of the character appearing on this record are insufficient to create any presumption on which the courts can act. The question of actual survivorship is regarded as unascertainable, and descent and distribution take the same course as if the deaths had been simultaneous.''

In that case a mother and her son were upon a vessel which sank a few moments after it had collided with another vessel. The mother was 52 years of age, corpulent and short of breath. The son's age was 23. He was single and a good swimmer.

*McKinney v. Depoy,* 213 Ind. 361, 12 N. E. 2d 250, quoted as follows from *McGowin v. Menken,* 223 N. Y. 509, 119 N. E. 877, 5 A. L. R. 794:

"In the case of the death of two or more persons in a common disaster, there is no presumption either of survivorship or simultaneous death."

We quote the following from *Newell v. Nichols,* 75 N. Y. 78, 31 Am. Rep. 424:

"These expressions only mean that as the fact is incapable of proof, the one upon whom the *onus* lies fails, and the persons thus perishing must be deemed to have died at the same time, for the purpose of disposing of their property.  *  *  *  And Mr. Best in his work on Presumptions, after laying down the general rule, states, that it is not correct to infer from this that the law presumes both to have perished at the same moment, and adds: 'The practical consequence is however nearly the same, because if it cannot be shown which died first, the fact will be treated by the tribunal as a thing unascertainable, so that for all that appears to the contrary, both individuals may have died at the same moment.'

"All the common law authorities are substan-

tially the same way, and the rule, which I think is wise and safe, should be regarded as settled.''

We take from *Russell v. Hallett*, 23 Kan. 276, the following:

"In the absence of other evidence, the fact as to who was the survivor, where several persons perish in the same catastrophe, is assumed to be unascertainable, and property rights are disposed of as if death occurred to all at the same time. While therefore it is correct to say the law makes no presumption on the subject, the practical consequence is nearly the same as if the law presumed all to have perished at the same moment.''

*In re Macklin's Will*, 30 N. Y. S. 2d 706, 177 Misc. 432, contains the following:

"Surrogate Foley, in Matter of Burza's Estate, 151 Misc. 577, 272 N. Y. S. 248, 250, summarizes the law applicable to the case of the death of two or more persons in a common disaster as follows:

" '(1) There is no presumption either of a survivorship or of simultaneous death. McGowin v. Menken, 223 N. Y. 509, 511, 119 N. E. 877, 5 A. L. R. 794.

" '(2) There is no presumption of a survivorship from difference in age, sex or even relative strength. Matter of Englebirt's Will, 184 App. Div. 314, 171 N. Y. S. 788.

" '(3) Proof of the facts and circumstances concerning the survival of the one or of the others must be adduced. In the absence of proof of facts and circumstances, the testimony of experts is sheer speculation and must be disregarded. Matter of Englebirt's Will, supra; St. John v. Andrews Institute for Girls, 117 App. Div. 698, 102 N. Y. S. 808, affirmed 191 N. Y. 254, 83 N. E. 981, 14 Ann. Cas. 708.

" '(4) The party asserting survivorship has the burden of proving it. Newell v. Nichols, 75 N. Y. 78, 31 Am. Rep. 424.' ''

The following is taken from *Sweeney's Estate. O'Neil's Appeal,* 78 Pa. Super. 417:

"The rule of the common law is 'that where two or more persons perish in the same disaster, and there is no fact or circumstance to prove which survived, there is no presumption whatever on the subject. None arises from considerations of age or sex, and the law will no more presume that all died at the same instant than it will presume that one survived the other. It treats the case as one to be established by evidence, and lays the burden of proof on him who claims survivorship . . . In the absence of evidence from which the contrary may be inferred, all may be considered to have perished at the same moment; not because that fact is presumed, but because, from failure to prove the contrary by those asserting it, property rights must necessarily be settled on that theory. If there are other circumstances shown, tending to prove survivorship, courts will then look at the whole case for the purpose of determining the question, but if only the fact of death by a common disaster appears they will not undertake to solve it on account of the nature of the question, and its inherent uncertainty."

The decisions just reviewed were unaffected by the Uniform Simultaneous Death Act.

New York has adopted several parts of the Uniform Simultaneous Death Act, including the part which we have quoted; that is, Section 1. See New York Decedent's Estate Law, § 89, subd. 1, (Book 13 McKinney's Consolidated Laws of New York annotated, § 89 pocket part). *In re Gerasimoff's Estate,* 96 N. Y. S. 2d 142, and *In re Dukszta's Estate,* 87 N. Y. S. 2d 245, 193 Misc. 720, applied subdivision 1 of the New York act, being the exact counterpart of Section 1 of our act. In each of those cases, a husband and wife died from

gas asphyxiation. In *In re Gerasimoff's Estate,* after the public administrator had obtained letters of temporary administration over the husband's estate, the administrator of the wife's estate sought to oust him and have himself appointed as administrator of the husband's estate on a claim that the wife survived her husband. He argued that Section 89, subdivision 1, of the New York Decedent's Estate Law (§ 1 of the Uniform Simultaneous Death Act) created a presumption that the wife survived her husband. Surrogate Delehanty, in the decision which we have cited, held that the statute created no such presumption, and declared:

> "In view of the provisions of the statute and the admitted inability of the petitioner to establish that his intestate survived her husband, neither he nor her distributees have any interest in the decedent's estate."

In other words, the Surrogate held that the party claiming survivorship had the burden of proving it.

The issue in *In re Dukszta's Estate,* supra, had its inception in an application filed by a purported distributee for letters of administration upon the estate of the deceased husband. The public administrator challenged the petitioner's status as a distributee, and thereupon the collaterals of the deceased husband consented that the public administrator should be appointed. At that juncture the individual who had been appointed administrator of the deceased wife's estate filed a cross-petition for letters upon the husband's estate on the ground that she survived him. Pertaining to that situation, Surrogate Delehanty, author of the cited opinion, said:

> "If the cross-petitioner succeeds in proving that the wife survived, then the collaterals of the wife

will obtain deceased's property. If the evidence is insufficient to show that the parties died 'otherwise than simultaneously, the property of each person shall be disposed of as if he had survived.' Decedent's Estate Law, § 89, subd. 1.''

After stating the issues concerning the proof, the Surrogate said:

''Cross-petitioner has of course the burden of proof.''

The decision, after reviewing the evidence, held that the cross-petitioner had not discharged the burden which rested upon him, and had not shown that the wife survived her husband. Letters of administration were therefore denied to him. The decision was reversed by the Appellate Division in *In re Dukszta's Estate,* 90 N. Y. S. 2d 686, but only on the ground ''the so-called suicide note was germane to the issue.'' The Appellate Division's decision left wholly untouched the rule of the Surrogate which cast the burden of proof upon the party whose claim was dependent upon survivorship. Manifestly, it approved that part of the Surrogate's decision.

We shall review the authorities no further. *In re Gerasimoff's Estate* and *In re Dukszta's Estate* are entitled to peculiar weight. The act before us says:

''This act shall be so construed and interpreted as to effectuate its general purpose to make uniform the law in those states which enact it.''

Oregon Laws 1947, chap. 555, § 7. Although New York made some changes in the Uniform Simultaneous Death Act, it adopted verbatim Section 1, the part which we are called upon to interpret and apply.

The authorities convince us that, in the absence of legislation, there is no presumption of survivorship,

and likewise none of simultaneous death. However, when, as in this case, a showing is made that the decedents perished in a common disaster survivorship will be deemed unascertainable, in the absence of sufficient evidence showing that one of them outlived the other or others. Whenever proof is lacking. that a specific one survived, the courts deem that all died in the same instant. The burden of proof falls upon the party whose claim is dependent upon survivorship to establish that fact. Section 1 of the Uniform Simultaneous Death Act requires proof of survivorship to be established by sufficient evidence. Evidence is sufficient when it satisfies an unprejudiced mind. The foregoing is our construction of Section 1 of the act. We are convinced that the burden of proof rested upon the respondents.

The respondents contend that the evidence indicates that Mr. Cruson survived his wife. They depend upon the testimony which shows that Mr. Cruson's health was better than Mrs. Cruson's; that Mrs. Cruson, a short time before the accident, suffered a severe attack of illness; that Mr. Cruson was larger and stronger than his wife; that rigor mortis was much more pronounced in Mrs. Cruson's remains than in his; that when the husband's body was taken from the water a blood-like substance oozed from the wound in his head; and that his body was about five or six feet upstream from the car, whereas the wife's body had floated a quarter of a mile or more downstream. The position of the bodies is seized upon by the respondents' brief as the basis for the following contention:

> "The position of his body as it rested with its head practically above water on the shore and the feet extending at about a 30 degree angle downstream from the shore is a circumstance and a rather convincing circumstance that he was con-

scious after the car reached the water and made it across the stream by walking or swimming to the only place that one could climb out of the river at that position along the bank of the stream. \* \* \* The circumstances indicate that in the case of Mrs. Cruson she was helpless and subject to the drift of the current; in the case of Mr. Cruson he was alive, conscious, and made a valiant effort to reach the shore.''

The parties cite many decisions in which contentions similar to those made by the respondents received attention. Those submitted by the respondents are *Marttinen v. Hakomaki,* 171 Minn. 475, 214 N. W. 469; *Vaegemast v. Hess,* 203 Minn. 307, 280 N. W. 641; and *Clarke v. Bryson,* 136 Cal. App. 521, 29 P. 2d 275. We read those decisions and all cited by the State, together with several others. Virtually the only material impression that we received from the reading is that a catastrophe and its victims never sufficiently resemble a later misfortune and its victims to render the analysis of evidence pertaining to age, health, rigor mortis, and so forth, made in any of them of value in others.

The two Minnesota decisions cited by the respondents were influenced by medical testimony which lent meaning and significance to the wounds upon the victims. In the Vaegemast decision the court said:

''Deloss Hess suffered a complete dislocation of the articulation between the skull and atlas bone at the instant of impact; \* \* \* the spinal cord was completely severed between the base of the skull and the atlas bone. \* \* \* In the opinion of the plaintiff's medical experts he suffered the loss of both of the critical functions of circulation and respiration instantly or within one or two seconds after the impact of the collision. The defendant's doctors estimated that death occurred from thirty seconds to five minutes after the im-

pact * * *. From the enumerated conditions found at the autopsy of Mrs. Hess' body, plaintiff's medical experts concluded that she did not die until a minute or a minute and a half after the impact and as before stated the defendant's experts have little or no quarrel with this conclusion.''

Under those circumstances, the judgment which the trial court had entered in the plaintiff's favor was affirmed.

The Marttinen case was concerned with the issue as to whether a husband, who first shot his wife, then wrote a note and next killed himself, was survived by his wife. The decision said:

''The jury had to determine the question submitted almost wholly upon the medical experts' opinions based upon the wounds inflicted and the testimony as to bleeding. Their unanimous conclusion was that the husband's death followed almost instantaneously the self-inflicted wound; but that the wounds received by the wife and the bleeding resulting indicated that death did not come to her for quite a period after being shot. The time estimated varied from thirty minutes to two hours.''

The decision held that the verdict was supported by substantial evidence. In both of the Minnesota cases the evidence showed the cause of death of the victims.

In the California case (*Clarke v. Bryson*), husband and wife died from gunshot wounds, and thereupon a controversy arose over the disposition of some insurance money. The trial court decided the issue in favor of the estate of the wife. The autopsy surgeon described the wounds upon the two bodies, and testified that they did not necessarily imply instant death. A police officer, who was the first person to reach the scene of the tragedy, testified: ''I observed that

Clarke's (husband's) body was colder than that of Mrs. Kendace H. Clarke.'' California had a statute which created a series of presumptions similar to those contained in repealed subsection 41 of § 2-407, O. C. L. A. The decision, in affirming the action of the trial court which refused to embrace the available presumption, held that the evidence disclosed "particular circumstances" which warranted its action. It said:

"It appears from appellant's brief that circumstances existed here to support the court's finding that the wife survived the husband. We need mention only one of them. Officer Condaffer, referring to the time when he found the bodies, testified: 'Clarke's body was colder than that of Mrs. Kendace H. Clarke.' * * * Of course, this circumstance supports the conclusion of the trial court, and as above indicated there are other circumstances of like import, * * *.''

In that case, both bodies were found at the same time and in the same place; that is, the home of the decedents. In the case at bar, the wife's remains were not found until two hours after her husband's. In the interval it lay in the swift, cold current of a mountain stream. Further, in the case before us, the only evidence upon the subject indicates that rigor mortis is variable and cannot be depended upon to show when death occurred.

We cannot embrace the respondents' contention that the position of Mr. Cruson's body shows that he walked or swam from the disabled car across the stream to the place where his remains were found. The very witness upon whose testimony this contention is grounded, swore: "Personally, I would say it would be impossible for a man to walk crosswise of the current." The respondents' contention means that, although Mr.

Cruson had a fractured arm and a puncture in his skull large enough to admit a finger and deep enough to penetrate his brain, he nevertheless got out of his car, crossed in front of it and then made his way through the cold, rushing stream to the opposite bank. We must bear in mind that the bed of the stream was composed of boulders which afforded treacherous footing and that the purported feat was performed in the blackness of the night. We cannot believe that a badly disabled man, 62 years of age, accomplished an exploit which the hardy forest ranger deemed impossible for his own accomplishment. If one is to engage in conjecture, it seems to us that it would be more sensible to infer that when the careening car landed upon its top upon the ledge which we have described, Mr. Cruson was thrown out of it to the spot where his body was later found. That spot was near the ledge. His body lay upon a rocky surface.

To find that Mr. Cruson was the survivor, one would have to determine that he lived beyond the period in which the edema formed in his wife's face. It will be recalled that the respondents concede that Mrs. Cruson's injuries were not immediately fatal and that she lived while the edema was forming.

When the fast-moving car left the pavement and plunged over the rocky cliff, the occupants, if they were then awake, must have realized that death was about to seize them unless a miracle would intervene. In the brief interval which was available to struggle against death, the greater strength of the man, upon which the respondents dwell, may have served him; or it may be that he was knocked senseless before he had an opportunity to use any of his faculties.

An insurmountable difficulty to the determination

of survivorship is the fact that the record does not show the cause of death of either of these two people. It is true that each had a fractured skull and other injuries which the witnesses mentioned, but no one knows whether any of those injuries were, in fact, the cause of death of either of them. It may be that each had a broken back; likewise, it may be that either or both of them died from drowning. Much time was spent during the trial in efforts to prove how many of the doors were flung open by the force of the impact. Seemingly, the purpose was to show that one or more of the occupants may have fallen out of the doors. Death, unlike the car, has innumerable doors, and no one can know by what means death entered upon the scene.

In trying to determine whether one survived the other, we cannot engage in conjecture or guesswork. We cannot balance probability against probability. Survivorship is a question of fact which must be proved by evidence. The repeal of subsection 41 of § 2-407, O. C. L. A., is a clear indication that the legislature wishes survivorship to be established by proof. Since the evidence does not even disclose the cause of death, any conclusion concerning survivorship would be pure speculation.

■ This is another instance in which survivorship must be deemed unascertainable. That being true, the devolution of the estate of the wife, which is the subject matter of this proceeding, is governed by Section 1 of the Uniform Simultaneous Death Act. The attacked order or decree of the Circuit Court is reversed. The State is entitled to a decree in conformity with its petition.